**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

JAY HAWKINS,

    Plaintiff,

       v.                             Civil Action No. 12-cv-00623 AW

ISIAH LEGGETT et al.,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Jay Hawkins brings this employment discrimination action against several Defendants, including Montgomery County, Maryland. Pending before the Court are three Motions: (1) Defendants' Motion for Summary Judgment; (2) Plaintiff's Motion for Leave to Amend Complaint; and (3) Plaintiff's Motion for Sanctions for Fabrication and Spoliation of Evidence. The Parties have exhaustively briefed all outstanding Motions. The Court has carefully reviewed the record and deems a hearing unnecessary. For the following reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Leave to Amend Complaint, and **DENIES** Plaintiff's Motion for Sanctions for Fabrication and Spoliation of Evidence.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This consolidated case sounds in employment discrimination. Plaintiff Jay Hawkins is an African-American male who worked for the Montgomery County Department of Corrections and Rehabilitation (the Department) from 2006 to 2011 as a correctional officer. Defendants terminated Plaintiff in 2011 for lying and establishing an inappropriate relationship with an

inmate. Plaintiff has sued the following Defendants: (1) Montgomery County, Maryland (the County); the Department; Isiah Leggett, County Executive for Montgomery County, Maryland; and Arthur Wallenstein, Director of the Department.

The Department operates two detention facilities: (1) Montgomery County Correctional Facility, located in Boyds, Maryland; and (2) Montgomery County Detention Center, located in Rockville, Maryland. Slightly over three-hundred correctional officers are employed at these facilities. The racial and gender makeup of the employees is as follows: African-American officers—199 (66%) (55 female, 144 male); Caucasian officers—90 (30%) (8 female, 82 male); Hispanic officers—7 (2%) (2 female, 5 male); and Asian-American officers—7 (2%) (all male).

The facility where Plaintiff worked was divided into three units which, in turn, were subdivided into pods. A pod is an area of the jail that houses a cluster of inmate cells. Correctional officers were posted at various pods throughout the facility. According to Plaintiff, the "medium/maximum" pods were the most dangerous because most of the lockdowns occurred there. Plaintiff was often assigned to the medium/maximum pods in Unit 2.

In 2009 – 2010, Plaintiff became concerned about what he perceived as a pattern of discrimination in the post assignments of correctional officers. Basically, Plaintiff believed that African-American guards were substantially more likely to be assigned to the most dangerous posts (i.e., the medium/maximum pods). Plaintiff eventually complained to Department officials.

The Department investigated Plaintiff's concerns. A deputy of Warden Robert L. Green conducted the investigation. Based on the deputy's investigation, Warden Green concluded that there "could have been the appearance" of a problem. Subsequently, more Caucasian and Hispanic females were assigned to the most dangerous posts.

Apparently dissatisfied with the Department's response to his concerns, Plaintiff informally complained about discrimination to Warden Green in August 2010. Plaintiff followed up his informal complaint by filing an EEOC charge in September 2010.

On or around August 26, 2010, the Department's Training Manager, Daedra Carrio, determined that the Department needed four general instructors to help with the overall training of the correctional officers. Carrio impaneled a diverse selection committee. Although some of the diverse panel members that Carrio originally appointed could not participate in the interview process, Carrio, as a Hispanic female, added herself to the panel to ensure that it was diverse. The panel interviewed twenty applicants, of which it planned to choose four. Doc. No. 49-20 at 4, 7. The interviewers completed a consensus evaluation form for each candidate and ranked the candidates when the interviews were over. *Id.* at 9, 13. Although he received a favorable recommendation, the panel did not rank Plaintiff in the top four and, hence, did not choose him for the trainer position. *Id.* at 14. Carrio did not know about Plaintiff's discrimination complaint when the panel selected the candidates. *Id.* at 17. Although Warden Green evidently had to approve the panel's recommendation, the panel made the decision to select the trainers. *See id.* at 10; Doc. No. 65-5 at 4. Green later asked Carrio for the evaluation forms and selection packet. Doc. No. 49-20 at 11. Warden Green apparently misplaced the selection packet.

In February 2011, during the pendency of Plaintiff's EEOC charge, Defendants learned that Plaintiff might have formed an inappropriate relationship with an inmate. An inmate named "Inmate Moore" approached Jennifer Zuckerman, a Department employee, and told her that he had received a note indicating that a federal investigator wanted to speak with him regarding a discrimination complaint. Inmate Moore approached Warden Green on the same day and told him that he had received a letter in the mail and that someone wanted him to talk to a federal

investigator. Warden Green assigned Deputy Warden Gilliam and Zuckerman to investigate Inmate Moore's allegations. Gilliam and Zuckerman spoke with Moore and Moore gave them an "Inmate Pass" form with handwritten information written on the back. Doc. No. 49-29. Gilliam reviewed the handwriting and concluded that it was similar to Plaintiff's. Doc. No. 49-12 at 21–23; *see* Doc. No. 49-15 at 7–8.

On February 24, 2011, Gilliam met with Inmate Moore again. Moore allegedly told Gilliam that Plaintiff had sent him the letter and Inmate Pass form. Moore allegedly further stated that Plaintiff had given him another sheet of paper with several questions on it. Doc. No. 49-30. Gilliam also states that Moore told him that Plaintiff had let Moore out of his cell, approach the console and desk area where the correctional officers would sit, and let him look at information on a computer. Additionally, Gilliam states that Moore told him that Plaintiff wanted Moore's contact information so that Plaintiff or his lawyer could contact Moore when he left jail. Angela Washington, a Department official, interviewed Moore on the following day. Washington recommended that the Department go forward with a full investigation. Subsequently, Defendants placed Plaintiff on administrative leave with full pay pending an internal investigation by the Department. Doc. No. 49-3; *see* Doc. No. 49-31 at 2–3.

Bernard Woodard, a County investigator, led the investigation. In connection with his investigation, Woodard watched a videotape of the housing unit where the interactions between Plaintiff and Moore allegedly occurred and conducted some interviews. According to Woodard, Moore told him that Plaintiff wanted Moore to testify in the EEOC matter and that Plaintiff had let him out of his cell during unauthorized times. Moore also allegedly said that he thought Plaintiff was trying to pressure him to lie.

Woodard also interviewed Plaintiff. Woodard states that Plaintiff first told him that Plaintiff had not given Moore any written correspondence. Doc. No. 49-32 at 27–28. Woodard further states that he subsequently showed Plaintiff the two documents that Moore had produced, whereupon Plaintiff confessed that he had given Moore both documents. *Id.*

Plaintiff testifies that he saw Moore on February 21, 2011. Doc. No. 49-22 at 46. Plaintiff states that Moore told him that Moore had overheard a conversation between Officer Tarner and Lt. DeBoard in which they had gone into details about Plaintiff's EEOC complaint. *Id.* at 47–48. Plaintiff further testifies that Moore told him that he had heard Officer Tarner (Caucasian female) tell Lt. DeBoard that she could not stand Plaintiff's "black ass" and that she had received an undesirable post assignment because of Moore's complaint about perceived discrimination in post assignments. *Id.* at 74. In response, Plaintiff wrote down some information on two pieces of paper, one of which was the Inmate Pass form. *Id.* at 49. Plaintiff also states that he jotted down this information to inform Moore that Moore needed to tell the information to the EEOC investigator handling Plaintiff's discrimination complaint. *Id.* at 50.

On June 13, 2011, Woodard submitted a Memorandum memorializing the findings of his investigation. Doc. No. 49-33. Woodard made the following significant findings: (1) Plaintiff allowed Moore to remain outside of his cell during unauthorized times to validate Moore's allegations of discrimination and because Plaintiff was distraught after hearing Moore describe details of Plaintiff's EEOC complaint; (2) Plaintiff showed Moore post assignments and incident reports to confirm what Moore told Plaintiff; (3) Plaintiff saved Department documents to his personal flash drive to assist him with the filing of a discrimination complaint against Warden Green; (4) Plaintiff discussed the actions of his colleagues with Moore, thereby diminishing respect for Officer Tarner and reducing staff morale. Based on these findings, Woodard

generally concluded that Plaintiff violated standards of conduct, codes of ethics, personnel regulations, and various other rules and policies. *Id.* at 8–9.

On July 19, 2011, the Department issued a Statement of Charges (Statement). The Statement outlines numerous personnel regulations, standards of conduct, and codes of ethics that Plaintiff's conduct violated. Doc. No. 49-6. The Statement notified Plaintiff that these violations could serve as a basis for his dismissal. Based on the procedural options the Statement presented, Plaintiff voluntarily participated in an ADR process pursuant to a collective bargaining agreement (CBA) between his union and the County. The ADR committee could not make a recommendation. Thereafter, on August 26, 2011, Defendant Wallenstein issued a Notice of Disciplinary Action (Notice) dismissing Plaintiff from County employment. Doc. No. 49-9. The Notice is similar to the Statement and generally sets forth the following bases for dismissal:

> forming an inappropriate relationship with an inmate; allowing an inmate to remain unsecured out of his cell at unauthorized times; making a false statement to the investigator about the relationship with the inmate; using a flash drive to store County information and then sharing that information with an inmate for personal gain; secretly developing the relationship with the inmate and coercing him to lie against departmental officials; giving the inmate privileges he was not otherwise allowed (allowing him out of cell at unauthorized times) and placing the security of the inmate and the facility in jeopardy; corresponding with the inmate for personal gain and not reporting the information received from the inmate to a supervisor; showing confidential information to the inmate when allowing him near the officer's station in viewing of the County computer; soliciting information from an inmate regarding other staff for personal gain; and

> making untruthful statements regarding written correspondence with an inmate
> and then retracting those statements when presented with copies of that
> correspondence.

Doc. No. 49-1 at 13; *see* Doc. No. 49-9.

Plaintiff grieved his termination. Pursuantly, Plaintiff and the County participated in a binding arbitration. The Parties stipulated that the issue was "[whether] the discharge of [Plaintiff] was based on just cause?" Doc. No. 49-10 at 2. The arbitrator held a two-day, trial-like hearing in which counsel represented both Parties. The Parties presented the testimony of several witnesses and submitted numerous documents. After the hearing, the Parties submitted written arguments. In the end, the arbitrator issued a fourteen-page, single-spaced decision holding that the County met its burden of proving that it had terminated Plaintiff for just cause. *Id.* at 9–14.

Plaintiff instituted this action in the Circuit Court for Montgomery County, Maryland. Defendant removed the case on February 27, 2012. Although Plaintiff's Complaint sounds in employment discrimination, it also features an assortment of due process claims under federal and state law. Plaintiff filed a parallel action arising out of the same operative facts before Judge Chasanow. In the parallel action, Plaintiff asserted related discrimination and retaliation claims. Judge Chasanow later consolidated that action with this case. The consolidated case presents the following claims: (1) section 1981—racial discrimination; (2) section 1981—retaliation; (3) section 1983—equal protection; (4) Maryland Declaration of Rights—equal protection; (5) section 1983—procedural due process; (6) Maryland Declaration of Rights—procedural due process; (7) section 1983—substantive due process; (8) Maryland Declaration of Rights—substantive due process; (9) violation of administrative due process—*Accardi* doctrine; (10) Title

VII—racial discrimination; (11) Title VII—retaliation; (12) Maryland Code—racial discrimination; and (13) Maryland Code—retaliation. *See* Doc. Nos. 2, 27.

The Parties filed partial motions for summary judgment on Plaintiff's procedural due process claims. The Court ruled on these motions in a Memorandum Opinion issued on January 11, 2013. Doc. No. 61. The Court denied Plaintiff's motion for partial summary judgment and granted Defendants' cross-motion for partial summary judgment. Consequently, the Court dismissed the following claims: (1) section 1983—procedural due process; (2) Maryland Declaration of Rights—procedural due process; and (3) violation of administrative due process—*Accardi* doctrine.

After discovery, Defendants filed a lengthy Motion for Summary Judgment. Doc. No. 49. Plaintiff filed an even lengthier Response. Doc. No. 54. Defendants' Motion for Summary Judgment is ripe. Plaintiff has filed a barebones Motion for Leave to Amend Complaint (Doc. No. 55), as well as a Motion for Sanctions for Fabrication and Spoliation of Evidence (Doc. No. 56). These Motions are ripe as well.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists.

*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.*

Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.     LEGAL ANALYSIS

### A.     Title VII—Retaliation

Plaintiff argues that Defendants retaliated against him in six different ways. All of these theories lack merit.

#### 1.     Nonselection for the Trainer Position

The Court assumes that Plaintiff's August 2010 communication to Warden Green about perceived discrimination constitutes protected activity. The Court also generally assumes that the failure to promote an employee constitutes a materially adverse action. *See Volovsek v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003) (citation omitted) (stating that "[t]he failure to promote is an adverse employment action with respect to

discrimination and to retaliation claims"). *But cf. Buckley v. Mukasey*, 538 F.3d 306, 316 n.13 (4th Cir. 2008) (seeming to express skepticism about the idea that the failure to promote constitutes a materially adverse action).

As to prong (3), however, a reasonable juror could not conclude that Plaintiff's protected activity caused Defendants' failure to promote. Plaintiff has submitted no evidence suggesting that the panel members knew about his protected activity. *See Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) (citations omitted) ("To establish a causal connection between a protected activity and an adverse action, a plaintiff must prove . . . that the employer knew the employee engaged in a protected activity."). Carrio and Green testified that the panel made the final decision to select the trainers and that Warden Green played no meaningful role in the process. The record contains no evidence that Plaintiff or Warden Green relayed Plaintiff's complaint to any panel members.

Plaintiff observes that the late-August 2010 failure to promote occurred close in time to his August 2010 protected activity and concludes that this temporal proximity is probative of causation. But absent some threshold showing that Defendants planned to pick Plaintiff for the position, it is unapparent how mere temporal proximity between the protected activity and the failure to promote could support an inference of retaliation. Otherwise, an inference of retaliation would arise any time employees, irrespective of qualifications or the employer's legitimate needs, complained about discrimination and employers failed to promote them shortly thereafter. Although Plaintiff arguably was qualified for the trainer position, there is not enough evidence to reasonably conclude that Defendants were bound to select Plaintiff over the other qualified applicants. *See* Doc. No. 49-20 at 18, 22–24.

Even if a reasonable juror could infer causation, no reasonable juror could conclude that Defendants' nonretaliatory reasons for selecting the other candidates conceal retaliation. To reiterate, the selection committee interviewed nearly twenty applicants and determined that there were better people for the position. Plaintiff invites the Court to infer that the panel truly selected Plaintiff for the position because Defendants failed to produce the selection packet. To so infer would be unreasonable because, inter alia, Carrio sat on the panel and testified that, although Plaintiff was a "decent presenter" and "performed well," "there were others that . . . performed better." *Id.* at 23–24. No evidence suggests that these neutral reasons serve to suppress retaliatory animus. Accordingly, no reasonable juror could conclude that Defendants retaliated against Plaintiff by failing to take him as a trainer.

### 2. Calling Out Protected Activity at Roll Call

Plaintiff argues that Defendants retaliated against him for filing an EEOC complaint in September 2010 by "calling him out" in front of others. Specifically, Plaintiff asserts that, in October 2010, Lt. DeBoard told Plaintiff during roll call to "Stop whining about his post assignments" and to "Stop snitching." Of course, Plaintiff's filing of the EEOC complaint constitutes protected activity. Further, the Court assumes that Plaintiff's filing of the EEOC complaint induced Lt. DeBoard to make said remarks. Still, a reasonable juror could not conclude that Lt. DeBoard's action was materially adverse. *See, e.g.*, *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (holding that allegations that employee's supervisors "yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back" were insufficient to state Title VII claim); *Cepada v. Bd. of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 515 (D. Md. 2011) (holding that allegations that employee was "yelled at for complaining about his discriminatory

treatment and 'criticized' . . . [were] not materially adverse actions"). Moreover, there is no evidence that Lt. DeBoard knew who had filed the complaint when he made his remarks. *See* Doc. No. 30 at 6; Doc. No. 53 at 38. Thus, theory (2) presents no triable issues.

        *3.*     *Employer Allegedly Conducts Biased Investigation*

        Plaintiff argues that Defendants conducted a biased investigation of his second charge of discrimination, which he filed in March 2011. Plaintiff alleges that the investigation was biased because the report in which it culminated did not address Plaintiff's allegation that Defendants failed to choose him as a trainer for discriminatory reasons. Plaintiff also argues that the investigative report is biased because it does not address Lt. DeBoard's command to "Stop whining about your post assignments" and how it "may have influenced witness testimony about post assignments." No reasonable juror could find this action materially adverse. This Court has looked with skepticism on the idea that the failure to investigate allegations of discrimination constitutes materially adverse action. *See Westmoreland v. Prince George's County, Md.*, 876 F. Supp. 2d 594, 605 (D. Md. 2012) (citations omitted). Such "action" is no more adverse than the "[d]issatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" that the Fourth Circuit has consistently held to lack material adversity. *Williams*, 370 F.3d at 434 (alteration in original) (citation omitted); *cf. Crockett v. SRA Int'l*, Civil Action No. 8:13–cv–00261–AW, 2013 WL 1856447, at *8 (D. Md. May 1, 2013) (publication forthcoming) (citing cases). Furthermore, as explained herein, Plaintiff's complaint that Defendants retaliated against him by failing to select him for the trainer position lacks merit. Finally, Plaintiff's concern that Lt. DeBoard's remarks "may have influenced witness testimony" is speculative. For these reasons, no reasonable juror could conclude that act (3) is retaliatory.

####     4.      *Employer Loses Selection Packet*

This argument is a roundabout way of saying that Defendants retaliated against Plaintiff by not selecting him for the trainer position and/or that Defendants' failure to produce the packet warrants sanctions. The notion that Defendants retaliated against Plaintiff by choosing other candidates for the trainer position fails for the reasons stated in Part III.A.1. The idea that Defendants' conduct calls for sanctions fails in view of the analysis in Part III.M.2.a. Also, Plaintiff has adduced no authority proposing that losing a selection packet is a materially adverse action, and the Court is aware of none. Therefore, no reasonable juror could conclude that act (4) is retaliatory.

####     5.      *Placing Plaintiff on Prolonged Administrative Leave*

Defendants placed Plaintiff on administrative leave on February 25, 2011 and terminated him on September 9, 2011. Plaintiff argues that his six-month placement on administrative leave amounted to a materially adverse act because, although he received full pay, he could not earn overtime or holiday pay. Drawing all reasonable inferences in Plaintiff's favor, the Court assumes that Plaintiff has created a triable issue regarding material adversity. *See Blakes v. City of Hyattsville*, Civil Action No. 10–CV–3585 AW, 2012 WL 5566784, at *9 (D. Md. Nov. 14, 2012) (publication forthcoming) (holding that a suspension with pay may constitute materially adverse action for the purposes of retaliation claims depending on the facts of the case). However, Plaintiff has failed to create a triable issue on the question of causation. Although Plaintiff filed his EEOC charge in September 2010, Defendants did not place him on administrative leave until nearly March 2011, which is a span of approximately six months. Plaintiff has offered no other evidence probative of retaliation and, as a consequence, endeavors to establish causation solely via temporal proximity. *See, e.g.*, *Westmoreland*, 876 F. Supp. 2d at

613 (citation omitted). Temporal proximity of six months, however, is insufficient to state a prima facie case of causation. *See, e.g.*, *Crockett*, 2013 WL 1856447, at *8 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) ("Standing alone . . . temporal proximity of four months is insufficient to suggest causation.").

Plaintiff argues that he complained about discrimination in December 2011 via "electronic communication" and that the temporal proximity between December 2011 and February 25, 2011 supports an inference of causation. But the record does not reflect that the December 2011 electronic communication constituted the transmission of a reasonable belief that Defendants had discriminated against Plaintiff. *Cf. Crockett*, 2013 WL 1856447, at *7 (citation and internal quotation marks omitted) ("Opposition almost always arises when an employee communicates to her employer her reasonable belief that the employer has engaged in discrimination."). Plaintiff's affidavit simply states that he "provided the County EEO Office substantial information from my thumb drive about post assignments." Doc. No. 54-2 ¶ 19. One cannot infer that Plaintiff believed Defendants had discriminated against him from this statement, let alone that the belief was reasonable. The other document Plaintiff cites to support the contention that he complained about discrimination in December 2010 is irrelevant to this question. *See* Doc. No. 54-17. Accordingly, no reasonable juror could conclude that Defendants retaliated against Plaintiff by placing him on administrative leave.

### 6.     *Termination Based on Fabricated Evidence*

Plaintiff asserts that Defendants terminated him based on "fabricated evidence" and concludes that this action supports a retaliation claim. This is another way of saying that the Court should impose sanctions based on Defendants' alleged fabrication of evidence. The Court considers and rejects this argument in Part III.M.1.

**B.      Title VII—Racial Discrimination**

Plaintiff asserts that Defendants discriminated against him in the following ways: (1) disparate treatment in termination; (2) disparate treatment in post assignments; (3) disparate treatment in the nonselection for the trainer position. All of these theories are meritless.

*1.      Discriminatory Discharge*

"To succeed on a discriminatory discharge claim, a plaintiff must demonstrate, under the burden-shifting approach applicable here, that: (1) [he] is a member of a protected class under Title VII; (2) the prohibited conduct in which [he] engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) [he] suffered more severe discipline for [his] misconduct as compared to those employees outside the protected class." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (citations omitted). Defendants concede that Plaintiff, as an African American, is a member of a protected class. Furthermore, as Defendants fired Plaintiff but not his comparators, the Court assumes that element (3) is satisfied.

As for element (2), however, no reasonable juror could conclude that Plaintiff's conduct is comparable in seriousness to the alleged misconduct of his comparators. Plaintiff asserts that Defendants terminated him because he "lied during an investigation about establishing a relationship with an inmate." Doc. No. 54 at 63. Plaintiff then contends that two white officers engaged in similar conduct and that Defendants did not discharge them.

The salient flaw in this argument is that it grossly oversimplifies the reasons for which Defendants terminated Plaintiff. The Notice enumerates twenty-six "facts and circumstances" for which Defendants terminated Plaintiff. Doc. No. 49-9 at 1–6. Defendants succinctly summarize the substance of the Notice:

The grounds for the dismissal were that Mr. Hawkins violated various sections of

the MCPR and Departmental Policy and Procedure 3000-7 Standards of Conduct,

including forming an inappropriate relationship with an inmate; allowing an

inmate to remain unsecured out of his cell at unauthorized times; making a false

statement to the investigator about the relationship with the inmate; using a flash

drive to store County information and then sharing that information with an

inmate for personal gain; secretly developing the relationship with the

inmate and coercing him to lie against departmental officials; giving the inmate

privileges he was not otherwise allowed (allowing him out of cell at unauthorized

times) and placing the security of the inmate and the facility in jeopardy;

corresponding with the inmate for personal gain and not reporting the information

received from the inmate to a supervisor; showing confidential information to the

inmate when allowing him near the officer's station in viewing of the County

computer; soliciting information from an inmate regarding other staff for personal

gain; and making untruthful statements regarding written correspondence with an

inmate and then retracting those statements when presented with copies of that

correspondence.

Doc. No. 49-1 at 13 (citing Doc. No. 49-9).

These facts and circumstances fail to compare to those surrounding the officers who

Plaintiff alleges established inappropriate relationships with inmates but that Defendants did not

terminate. According to Plaintiff, Officer G (African-American female) was involved in an

incident with Officer Tarner (Caucasian female) in which Tarner asked Officer G about being a

pole dancer. Defendants investigated the incident and discovered that an inmate had called

Officer G a pole dancer. Doc. No. 49-17 ¶ 17a. The Department found both officers in violation

of Department policy because they failed to report the name-calling incident. *Id.* The Department

did not find that the interaction amounted to "an inmate's attempt to exert authority over a fellow

officer by discrediting the officer." *Id.* Both Officers returned to full duty after the investigation

ended. *Id.* Thus, there is no factual basis to conclude that Tarner had established an inappropriate

relationship with an inmate or had lied about it. And even had Tarner encouraged the inmate to

call Officer G a pole dancer, such conduct does not liken to Plaintiff's lying, using an inmate for

personal gain, and jeopardizing the safety of the facility. *Cf. Haywood v. Locke*, 387 F. App'x

355, 359 (4th Cir. 2010) (Plaintiffs are "required to show that they are similar in all relevant

respects to their comparator.").

Nor could a reasonable juror conclude that Plaintiff's other comparator is similar to

Plaintiff in all material respects. Officer J (Caucasian male) allegedly made a racial remark. The

Department investigated the incident and failed to sustain the inmate's allegations because, even

though some other inmates allegedly corroborated the inmate's story, the Department determined

that it was the inmate's word against the Officer's. Doc. No. 49-19 at 2–3; Doc. No. 49-17 ¶ 17b.

Plaintiff maintains that, whereas Defendants took Inmate Moore's word over Plaintiff's,

Defendants took Officer J's word over the inmate at whom he allegedly directed the racial

remark. Yet the record does not reflect that Defendants took Officer J's word. Defendants just

concluded that they had insufficient evidence to sustain the inmate's allegations. Furthermore,

the one-time use of a racial slur, however hurtful, improper, or unlawful, does not amount to the

exploitative relationship that Plaintiff established with Moore. Thus, a reasonable juror could

only conclude that the conduct for which Defendants terminated Plaintiff lacks comparable seriousness to the alleged misconduct of his comparators.

Even had Plaintiff stated a prima facie case of discriminatory discharge, a reasonable juror could not conclude that Defendants' nondiscriminatory reasons are pretextual. "'Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors.'" *Blakes*, 2012 WL 5566784, at *6 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). "'Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Id.* (quoting *Reeves*, 530 U.S. at 148). Here, "the strength of Plaintiff's prima facie case is nonexistent as no reasonable juror could conclude that he has made out one." *Id.* "Therefore, the probative value of Plaintiff's proof that Defendants' nondiscriminatory reason[s] [are] false must be exceedingly high." *Id.* (citation omitted). Yet, save the posited exception of his effete comparative evidence, Plaintiff has presented no evidence probative of pretext. By contrast, Defendants have submitted voluminous evidence showing that they took the allegations that Plaintiff had established an improper relationship with an inmate seriously, thoroughly investigated the allegations, and made a factual determination that the allegations were true. It also bears mentioning that the Department is a racially integrated employer with African Americans constituting a near supermajority of the workforce. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580 (1978) ("Proof that his work force was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant on the issue of intent when that issue is yet to be decided.").

In his 73-page Response and other lengthy filings, Plaintiff argues ad nauseam that Defendants mistakenly determined that Plaintiff had established an improper relationship with

Moore. In so doing, Plaintiff misses the mark. To be exact, the question is not whether

Defendants correctly believed that Plaintiff had established an improper relationship with Moore.

*See Holder v. City of Raleigh*, 867 F.2d 823, 829 (4th Cir. 1989) ("Bad or mistaken reasons for a

decision may yet be non-discriminatory."); *cf. Bishop v. Wood*, 426 U.S. 341, 349–50 (1976)

("We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-

day administration of our affairs."). Rather, it is whether Defendants' nondiscriminatory reasons

disguise a discriminatory motive. Plaintiff has adduced no evidence from which one could

deduce that Defendants fired Plaintiff due to a discriminatory motive. Accordingly, Plaintiff's

discriminatory discharge claim is not viable.

2.      *Disparate Treatment in Post Assignments*

The Parties agree that, to establish a prima facie case for disparate treatment in post

assignments, Plaintiff must show: (1) membership in a protected class; (2) satisfactory job

performance; (3) an adverse employment action; and (4) different treatment of similarly situated

employees outside the protected class. *Cf. Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir.

2010) (citation omitted). Element one is met because Plaintiff is an African-American male. The

Court assumes that element two is satisfied to simplify the analysis.

No reasonable juror could conclude, however, that Plaintiff's assignment to the

medium/maximum pods in Unit 2 was an adverse employment action. Plaintiff argues that his

post was more dangerous because it is where "the most pod lockdowns occur." *See* Doc. No. 54

at 66–67. However, Plaintiff does not meaningfully describe a pod lockdown or specifically

explain how it endangered Plaintiff. At most, Plaintiff's evidence suggests that his post

assignment engendered a potential increase in a generalized risk of harm. Such a debilitated

deduction of danger does not arise to the "appreciably more dangerous [working] conditions"

necessary to defeat a motion for summary judgment. *Cf. Sherman v. Westinghouse Savannah River Co.*, 263 F. App'x 357, 370 (4th Cir. 2008). Plaintiff's argument is more akin to the idea that his post assignment amounted to an adverse action because it was more stressful or difficult. This is likewise an inadequate evidentiary basis to survive summary judgment. *See, e.g.*, *Williams*, 370 F.3d at 434 (alteration in original) ("[d]issatisfaction with work assignments, . . . or difficult or unpleasant working conditions" insufficient to withstand summary judgment); *Boone v. Goldin*, 178 F.3d 253, 255–56 (4th Cir. 1999) (Although [the plaintiff] may have experienced increased stress in the new job . . . , she did not allege discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion . . . .").

Nor could a reasonable juror conclude that Defendants treated non-African Americans differently with respect to post assignments. To buttress his argument, Plaintiff cites the following data: from February 2009 to December 2009, 27 black males from shift 3 worked 666 of the 969 more difficult assignments; during the same period, 4 African American females on shift 3 worked 17 of the more difficult assignments; during the same period, 14 white males worked 255 of the 969 possible difficult assignments; only one Caucasian female had been assigned to the medium/maximum pods in 2009; only one Hispanic female was assigned to Unit 2 in 2009 and she was not assigned to the medium/maximum pods; one Asian male handled 48 of the more difficult assignments; and, after Plaintiff complained about discrimination in post assignments, more Caucasian and Hispanic females started to work in the medium/maximum pods.

Standing alone, these statistics are insufficient for a reasonable juror to infer racial discrimination. At most, they show a statistical disparity between African Americans and

Caucasians in the allocation of the hardest post assignments. Although statistics are "unquestionably relevant" to proving a disparate treatment claim under Title VII, a mere statistical disparity is generally insufficient to prove disparate treatment. *Compare Carter v. Ball*, 33 F.3d 450, 456 (4th Cir. 1994) (citation and internal quotation marks omitted), *with Martin v. Citibank, N.A.*, 762 F.2d 212, 218 (2nd Cir. 1985) (citation omitted) ("statistical proof alone cannot ordinarily establish a prima facie case of disparate treatment under Title VII or § 1981"), *and Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 408 (D. Md. 1994) ("In the Fourth Circuit . . . statistical evidence alone is insufficient to raise an inference of discriminatory intent in a disparate treatment case."); *cf. McCleskey v. Kemp*, 481 U.S. 279, 297 (1987) (statistical disparities alone typically cannot prove intentional discrimination by state actor absent "exceptionally clear proof"); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08 (1977) (emphasis added) ("Where **gross** statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a **pattern or practice** of discrimination.").

Furthermore, in the context of a disparate treatment claim, "[t]he usefulness of statistics depends on the surrounding facts and circumstances." *Carter*, 33 F.3d at 456. Here, "Plaintiff's statistical evidence is threadbare." *Blakes*, 2012 WL 5566784, at *7. Although it may indicate that Defendants disproportionately assigned African-American guards to more dangerous posts, "the statistics do not reveal the underlying facts and circumstances" regarding these assignments. *Id.* Plaintiff would apparently have the Court believe that the sample of guards is sufficiently large to control for all of the individual differences (e.g., experience, performance, preference) that could account for the alleged disparity. However, no expert analysis accompanies Plaintiff's statistics and Plaintiff fails to discuss the guards' supposed material similarities.

Plaintiff's statistical evidence bears more holes. Facially, it shows that Defendants assigned a significant number of non-African American officers to the riskiest posts. As a corollary, one can infer that not all African Americans worked the most dangerous posts all the time. Problematically, moreover, the data covers only a 10-month period in 2009. Plaintiff worked for the Department from 2006 to 2011. The racial composition of the guards and the allocation of post assignments among them during this period indubitably informs whether invidious discrimination was afoot. Plaintiff has not explained why he failed to submit statistics for a wider swath of time, and the record reflects that Plaintiff had such evidence at his disposal. *See* Pl.'s Ex. 32.[1] Plaintiff bears the burden of identifying the relevant records in Exhibit 32 and explaining how they prove racial discrimination. *See* Fed. R. Civ. P. 56(c)(1) (emphasis added) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: . . . citing to **particular parts** of materials in the record . . . ."). Plaintiff failed to carry this burden. Nor does Defendants' post-complaint assignment of more Caucasian and Hispanic females to the minimum/maximum pods exhibit racial animus. This evidence likely constitutes a subsequent remedial measure and, hence, is inadmissible pursuant to Federal Rule of Evidence 407. Assuming its admissibility, the evidence lacks probative puissance. Defendants conceded only that there might have been an "appearance" of a problem and Defendants evidently did not increase the number of Caucasian males assigned to the most dangerous posts. If anything, this response would suggest that Defendants were concerned about the overrepresentation of African-American *females* in the highest risk pods. Yet even this inference is a stretch. Caucasian and Hispanic females constituted only 3% of the officers (African-American females, by contrast, constituted 18%) and this sample may be too small to reliably support an inference of

---

[1] Plaintiff's Exhibit 32 is a lengthy compilation of scanned business records that Plaintiff filed in the form of a data disc.

underrepresentation. In sum, no reasonable juror could infer that Defendants discriminated against Plaintiff based on the proffered statistics.

### 3. Nonselection for Trainer Position

In essence, Plaintiff argues that Defendants discriminated against him by failing to promote him to the trainer position. "To make out a prima facie case of racial discrimination in the failure to promote, Plaintiff must show that (1) [he] is a member of a protected group, (2) [he] applied for the promotion, (3) [he] was qualified for the promotion, and (4) Defendant failed to promote [him] under circumstances that give rise to an inference of unlawful discrimination." *Crockett*, 2013 WL 1856447, at *6 (citation omitted). There is no dispute that elements (1) and (2) are satisfied. To streamline the analysis, the Court also assumes that Plaintiff has submitted sufficient evidence to infer that he was qualified for the position.

Nevertheless, no reasonable juror could conclude that Defendants failed to promote Plaintiff under circumstances giving rise to an inference of unlawful discrimination. Plaintiff asserts that Defendants chose a Caucasian that, while holding the same rank as Plaintiff, had less experience, particularly in the medium/maximum pods, and concludes that this discrepancy proves discrimination. This argument fails for various reasons. First, Plaintiff has cited no relevant evidence to support the proposition that Defendants selected a less-experienced Caucasian employee. *See* Doc. No. 54 at 71 (citing Pl.'s Exs. 17 & 32). The cited section of Exhibit 17 does not discuss the Caucasian employee's qualifications. Nor does Plaintiff cite any particular portions of Exhibit 32 that show that the Caucasian employee was less experienced. Even if the evidence showed that the Caucasian employee was less experienced, this mere fact does not suggest unlawful discrimination. The committee considered four major criteria, none of which is experience per se. S*ee, e.g.*, Doc. No. 49-20 at 22. Furthermore, Carrio testified that

others "performed better" than Plaintiff. *Id.* at 15. Thus, the evidence impels the inference that

the selected interviewees had more of the other relevant qualifications than Plaintiff.

Additionally, out of the four persons selected, one was African American and another Hispanic.

Doc. No. 49-20 at 17. This observation plainly undercuts any inference of discrimination.

Therefore, no reasonable juror could conclude that Defendants discriminated against Plaintiff by

failing to pick him for the trainer position.[2] [3]

## C.    Section 1981—Retaliation

Plaintiff's section 1981 retaliation claim fails as a matter of law. "It is well-settled that

the elements that plaintiffs must satisfy to state a prima facie case of retaliation under § 1981

equal the elements of a prima facie case of retaliation under Title VII." *Jenkins v. Gaylord*

*Entm't Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012) (citations omitted). Therefore, Plaintiff's

section 1981 retaliation claim fails for the reasons stated in Part III.A.

Furthermore, "when suit is brought against a state actor, § 1983 is the 'exclusive federal

remedy for violation of the rights guaranteed in § 1981.'" *Dennis v. County of Fairfax*, 55 F.3d

151, 156 (4th Cir. 1995) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989)).

"Thus, the § 1983 requirement that plaintiffs show an official policy or custom of discrimination

also controls in § 1981 actions against state entities." *Id.* In this case, Plaintiff has neither

---

[2] Even had Plaintiff stated a prima facie case for disparate treatment in his nonselection for the trainer position, Plaintiff has adduced inadequate evidence for a reasonable juror to conclude that Defendants' nondiscriminatory reasons are pretextual.  *See generally supra*.

[3] Plaintiff also pleaded that Defendants discriminated against him by denying one request for leave. Defendants argue that this claim fails in their Motion for Summary Judgment. Despite filing a Response totaling seventy-three pages, Plaintiff does not respond to this argument. Therefore, the Court considers Plaintiff to have abandoned this claim. *Benahmed v. BAE Sys. Tech. Solutions & Servs., Inc.*, Civil Action No. 12–cv–01974–AW, 2013 WL 80160, at *3 (D. Md. Jan. 4, 2013) (citations omitted). Furthermore, this claim would have failed even had Plaintiff not abandoned it. One, Defendants allowed Plaintiff to take the leave he had requested once another employee donated his. Two, even had Defendants denied Plaintiff's request, a one-time denial of a request for weekend leave is not an adverse action. Three, Plaintiff's comparative evidence is insufficient to create a reasonable inference of racial discrimination. *See* Doc. No. 49 at 40–41, 51–53 (citations omitted).

pleaded nor proved the existence of an official policy or custom of discrimination on the County's part. Quite the contrary, the Montgomery County Code prohibits employment discrimination. *See* Mont. Cnty. Code, chap. 27, art. I, § 27-19. Likewise, the Department is racially integrated. Consequently, Plaintiff's section 1981 retaliation claim lacks viability.

**D.     Section 1981—Racial Discrimination**

Courts judge section 1981 racial discrimination claims under the same standards as Title VII. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Therefore, Plaintiff's section 1981 racial discrimination claim fails for the reasons stated in Part III.B. And, as noted, section 1983 is the exclusive federal remedy for rights guaranteed in section 1981. As Plaintiff's suit is mainly against the County, *see* Part III.K, Plaintiff had to plead and prove an official policy or custom of discrimination. Plaintiff failed to do so. As a result, Plaintiff's section 1981 racial discrimination claim fails as a matter of law.

**E.     Section 1983—Equal Protection**

Plaintiff asserts an equal protection claim under section 1983. The Fourth Circuit usually applies the *McDonnell Douglas* framework to disparate treatment claims brought under section 1983. *See Love-Lane*, 355 F.3d at 786. Therefore, the Court incorporates its analysis from Part III.B, thereby disposing of Plaintiff's equal protection claim. Moreover, for the County to incur liability under section 1983, Plaintiff had to plead and prove that "the execution of a policy or custom of the municipality caused the violation." *Id.* at 782 (citation omitted). As discussed, Plaintiff has neither pleaded nor proved a municipal policy or custom of discrimination on the County's part. Furthermore, although Defendant Wallenstein signed the Notice, isolated incidents of unconstitutional activity typically do not suffice to establish a *Monell* claim. *See Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987) (citations omitted); *Blake v. Baltimore*

*County, Md.*, 662 F. Supp. 2d 417, 423 (D. Md. 2009) (citation omitted); *LaPier v. Prince George's County, Md.*, Civil Action No. 10–CV–2851 AW, 2011 WL 4501372, at *3 (D. Md. Sept. 27, 2011). Beyond that, the evidence is simply inadequate to support a reasonable inference that Defendants took the allegedly adverse actions with discriminatory intent. To prove this proposition, the Court incorporates by reference its analysis of Plaintiff's racial discrimination claim (Part III.B). In short, there is no direct evidence of discrimination, and the statistical and comparative evidence Plaintiff supplies is soft and does not sustain a reasonable inference of impermissible animus. Thus, Plaintiff's section 1983 equal protection claim fails as a matter of law.

**F.      Section 1983—Substantive Due Process**

 Plaintiff also asserts a section 1983 substantive due process claim. In his Complaint, Plaintiff predicates this claim on the same facts as his discrimination claims, and Plaintiff's Response offers no meaningful analysis of the substantive due process claim or explanation how it differs from his discrimination claims. *See* Doc. No. 54 at 57–58. It is well-established that, "'where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.'" *Rosa v. Bd. of Educ. of Charles Cnty., Md.*, Civil Action No. 8:11–cv–02873–AW, 2012 WL 3715331, at *6–7 (D. Md. Aug. 27, 2012) (quoting *Connecticut v. Gabbert*, 526 U.S. 286, 293 (1999)). Because Plaintiff has piggybacked his substantive due process claim onto his equal protection claim, his previously dismissed procedural due process claims, or both, said claim fails as a matter of law.

Plaintiff's substantive due process claim would fail even if Plaintiff could state it separately from his discrimination claims and previously dismissed procedural due process

claims. The facts in this case do not fit a "deliberate indifference" scenario, and the alleged discrimination is not "so arbitrary and egregious that it shocks the conscience and is unjustifiable by any government interest." *Moore v. Williamsburg Reg'l Hosp.*, 560 F.3d 166, 180 (4th Cir. 2009) (citation and internal quotation marks omitted). Plaintiff's allegations and evidence all point to the conclusion that Plaintiff personally disagrees with Defendants' decision not to pick him as a trainer and that he believes that Defendants fired him for unreasonable or mistaken reasons. However, as the Supreme Court has aptly written,

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.

*Bishop*, 426 U.S. at 349. Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's substantive due process claim.

**G.      Maryland Declaration of Rights—Equal Protection**

Plaintiff asserts a claim under Article 24 of the Maryland Declaration of Rights. "Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States." *Rosa*, 2012 WL 3715331, at *6 (citation omitted). "In other

words, [i]t has been clearly established that Article 24 protects the same rights as the Fourteenth Amendment." *Id.* (alteration in original) (citation and internal quotation marks omitted). "Therefore, the analysis under Article 24 is, for all intents and purposes, duplicative of the analysis under the Fourteenth Amendment." *Id.* (citations omitted). This being so, the Court incorporates by reference its analysis from Parts III.B, III.D, and III.E. Consequently, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Article 24 equal protection claim.

**H.      Maryland Declaration of Rights—Substantive Due Process**

Plaintiff asserts a substantive due process claim under Article 24 of the Maryland Declaration of Rights. As the analysis of this claim duplicates the analysis under the Fourteenth Amendment, this claim fails for the reasons stated in Part III.F.

**I.      Maryland Code—Racial Discrimination**

Plaintiff asserts a racial discrimination claim under the Maryland Fair Employment Practices Act (MFEPA). Courts judge such claims under the same standards as Title VII. *See, e.g.*, *Crockett*, 2013 WL 1856447, at *10 n.5 (citation omitted). Therefore, based on the Court's prior analysis, this claim is not viable. *See supra* Part III.B.

**J.      Maryland Code—Retaliation**

Plaintiff asserts a retaliation claim under the MFEPA. Courts also judge such claims under the same standards as Title VII. *See, e.g.*, *Crockett*, 2013 WL 1856447, at *10 n.6 (citation omitted). Thus, Plaintiff's MFEPA retaliation claim fails for the reasons stated in Part III.A.

**K.      Capacity Issues**

Plaintiff has sued the following entities: (1) the County; (2) the Department; (3) Isiah Leggett, County Executive; and (4) Arthur Wallenstein, Director of the Department. Plaintiff's

claims against all these Defendants fail for the reasons stated in this Opinion. *See generally supra.*

Plaintiff's claims against some of these entities fail on alternative grounds. Plaintiff's Title VII claims against Defendant Leggett fail because individual supervisors cannot incur liability under Title VII. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998). Furthermore, Plaintiff's section 1983 and related state law claims fail in relation to Leggett because Plaintiff has sued him in only an official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted) ("[A]n official-capacity suit is . . . to be treated as a suit against the entity . . . ."). Additionally, Plaintiffs have not pleaded or proved that Leggett was involved in the allegedly discriminatory actions. Accordingly, Plaintiff's claims against Defendant Leggett fail as a matter of law.

Plaintiff's claims against Defendant Wallenstein are deficient as well. As noted, Plaintiff cannot sue Defendant Wallenstein for a Title VII violation. *See Lissau*, 159 F.3d at 181. To the extent Plaintiff sues Wallenstein in his official capacity, Plaintiff's section 1983 claims and duplicative state law claims fail in light of *Graham*. Thus, all but Plaintiff's individual capacity claims against Wallenstein fail as a matter of law. And, as discussed, Plaintiff's residual individual capacity claims against Wallenstein present no triable issues. *See supra* Part III.A–J.

Plaintiff's claims against the Department, per se, fail as a matter of law. The Department is not a legal entity subject to suit. *See Rhodes v. Montgomery Cnty. Dep't of Corrs. & Rehab.*, Civil Action No. 12–cv–03172–AW, 2013 WL 791208, at *6 (D. Md. Mar. 1, 2013) (citations omitted) (recognizing that the Montgomery County Department of Correction and Rehabilitation is not a legal entity capable of being sued); *cf. Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 874 (4th Cir. 1989) (citation and internal quotation marks omitted) (Sheriff's office "not a

cognizable legal entity separate from . . . the county government of which this office is simply an agency."); *Farmer v. Balt. Cnty. Dep't of Corrs.*, Civil Case Nos. CCB–11–2126, CCB–11–2143, 2012 WL 3155650, at *3 (D. Md. July 31, 2012) (citations omitted) ("The Baltimore County Department of Corrections is a department within Baltimore County's administrative structure and consequently not subject to suit in its own name."); *Hines v. French*, 852 A.2d 1047, 1068 (Md. Ct. Spec. App. 2004) ("[A]ny claims made against the BCPD are essentially claims against Baltimore County . . . .").

The end result of the preceding section is that Plaintiff's suit is mainly against the County. However, Plaintiff has created no triable issues vis-à-vis the County.

**L.    Motion for Leave to Amend Complaint**

Plaintiff has moved for leave to amend his Complaint. Doc. No. 55. Once the scheduling deadline to file an amended complaint has passed, the moving party must satisfy the two-prong test under Federal Rules of Civil Procedure 15(a) and 16(b)(4) in order for the court to grant leave to amend a pleading. *See Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298–99 (4th Cir. 2008). The moving party must meet the threshold "good cause" standard of Rule 16(b)(4) before it can satisfy the second prong. *See id.* at 298. If the movant satisfies Rule 16(b)(4), the movant then must pass the test for amendment under Rule 15(a). *See id.* at 298–99; *see also Daso v. Grafton Sch., Inc.*, 181 F. Supp. 2d 485, 488 (D. Md. 2002).

Under Rule 16(b)(4), "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The movant satisfies the good cause requirement by showing that, despite diligence, the proposed claims could not have been reasonably brought in a timely manner. *See Montgomery v. Anne Arundel County, Md.*, 182 F. App'x 156, 162 (4th Cir. 2006). The factors a court considers in discerning good cause are the "danger of prejudice to the

non-moving party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, and whether the movant acted in good faith." *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768–69 (D. Md. 2010) (citation and internal quotation marks omitted).

In pertinent part, Rule 15 provides that courts should "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a). Therefore, courts should deny leave to amend only when "the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (citation and internal quotation marks omitted).

In this case, Plaintiff has failed the tests of both Rule 15(a) and Rule 16(b)(4). Although Plaintiff's Motion for Leave is not a proper motion, Plaintiff appears to seek leave to amend so that he can clarify (1) the entities whom he sues and (2) that he brings certain claims under the Fourteenth Amendment (as opposed to the Fifth). These amendments would be pointless in light of the analysis above. The Court has already analyzed all of Plaintiff's claims against all Defendants in their various capacities; there is no need to clarify which entities are suable. Furthermore, the Court treated Plaintiff's self-styled Fifth Amendment claims as arising under the Fourteenth Amendment. Indeed, "a Fourth Circuit case proposes that a plaintiff's failure to mention the Fourteenth Amendment in a complaint does not vitiate the validity of a § 1983 . . . claim." *Mejica v. Montgomery County, Md.*, Civil Action No. 8:12–cv–00823–AW, 2013 WL 326734, at *4 (D. Md. Jan. 28, 2013) (citing *Enweremadu v. Reichlin*, No. 92–1845, 1993 WL 311914, at *3 (4th Cir. Aug. 18, 1993)).[4]

---

[4] It is unclear whether Plaintiff seeks leave to add a *Monell* claim against the County. If so, the Court would consider such an amendment futile because Plaintiff has adduced no evidence that the County had an unlawful policy, pattern, or practice of discrimination. Section 27-19 of the Montgomery County Code prohibits employment discrimination, the Department is racially diverse, the Department picked an

It would be improper to grant leave to amend even if Plaintiff's proposed amendments were not futile. The Scheduling Order set an April 16, 2012 deadline for amendment of pleadings and, as amended, a December 3, 2012 cutoff for discovery. *See* Doc. Nos. 16, 18–19, 39, 47. Plaintiff did not move for leave to amend until December 20, 2012. Plaintiff has not explained why he could not have moved for leave to amend in a timelier fashion, and the record reflects that Plaintiff knew, or reasonably could have known, all the facts on which he predicates his Motion by the April 16, 2012 amendment deadline. Indeed, the fact that Plaintiff filed his Motion for Leave contemporaneously with his Response suggests that the Motion for Leave is a last-ditch attempt to circumvent the dismissal of his claims. For these reasons, Plaintiff has not shown good cause to modify the Scheduling Order. Consequently, the Court denies Plaintiff's Motion for Leave.

**M.      Motion for Sanctions for Fabrication and Spoliation of Evidence**

   *1.      Fabrication of Evidence*

Plaintiff asserts that Defendants fabricated an email. The email is a response from an official named Gail David to Deputy Warden Gilliam. Gilliam had asked in an earlier email for someone to collect some handwriting samples from Plaintiff and David replied that he had obtained four and would collect more if needed. Doc. No. 54-27. Plaintiff argues that this email is fabricated because a prior email in the chain to which David's email pertains has "strange carrot[] symbols, which are atypical for an Outlook e-mail." Doc. No. 56-1 at 15. Plaintiff also states that it was impossible for David to have sent this email at the time indicated in the "sent" line (13:32:16) because the County produced a video showing that David was doing something

---

African American for the trainer position, and some of the relevant decision makers are minorities. Plaintiff bases his apparent belief that the County has engaged in a pattern or practice of discrimination on nothing but raw speculation and conjecture.

else at 1:32, as evidenced by the time stamp on the video. Yet Defendants assert, and Plaintiff does not contest, that the video does not show David until 13:32:48, or thirty-two seconds later. David could have sent the email and reached his position in the video within thirty-two seconds. Furthermore, Plaintiff has not shown that the time mechanisms for the email program and the video were synchronized. If they were not, then David could have sent the email even more than thirty-two seconds earlier. It is common knowledge that different clocks tend to tell different times. Moreover, to assuage Plaintiff's concerns about the email, Defendants have attached a clean copy of the supposedly fabricated email. Defendants have also attached an email chain showing that it is possible for carrots to appear in Outlook email chains. Besides, even if the email is somehow fabricated, it does not forcibly follow that Defendants failed to compare the handwriting on the Inmate Pass and associated document with Plaintiff's. In fact, Plaintiff conceded that he presented both documents to Moore. For these reasons, Plaintiff's allegations that Defendants fabricated evidence are baseless.

2.      *Spoliation of Evidence*

Plaintiff seeks sanctions based on the alleged spoliation of the following items: (1) the selection packet; (2) Deputy Gilliam's notes of his interview with Inmate Moore; (3) Moore's allegedly formal, written complaint about his contact with Plaintiff; (4) computer records about pod helpers; and (5) an incomplete video of Plaintiff's interactions with Moore in the pod. The Court declines to impose sanctions for the alleged spoliation of any of these items.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citation omitted).

A party seeking sanctions for spoliation must prove the following elements:

> (1) [T]he party having control over the evidence had an obligation to
> preserve it when it was destroyed or altered; (2) the destruction or loss was
> accompanied by a "culpable state of mind;" and (3) the evidence that was
> destroyed or altered was "relevant" to the claims or defenses of the party
> that sought the discovery of the spoliated evidence, to the extent that a
> reasonable factfinder could conclude that the lost evidence would have
> supported the claims or defenses of the party that sought it.

*Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 509 (D. Md. 2009) (citation omitted).
"Should a court find that these above-described elements are met, then any sanctions imposed
must suit the purpose of leveling the evidentiary playing field and . . . the purpose of sanctioning
the improper conduct." *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 180 (D. Md. 2008)
(citation and internal quotation marks omitted).

      a.     Selection Packet

The Court declines to impose sanctions for the spoliation of the selection packet. The
Court agrees that Defendants had a duty to preserve the packet considering that Warden Green
apparently requested it in connection with Plaintiff's EEOC charge. *Cf. Silvestri*, 271 F.3d at 591
("The duty to preserve material evidence . . . extends to that period before the litigation when a
party reasonably should know that the evidence may be relevant to anticipated litigation."); 29
C.F.R. § 1602.14 ("Where a charge of discrimination has been filed . . . under title VII, . . . the
respondent employer shall preserve all personnel records relevant to the charge or action until
final disposition of the charge or the action."). The Court also assumes that Green's failure to

preserve the selection packet was grossly negligent. However, there is insufficient evidence to conclude that Green lost the selection packet in bad faith. *Cf. Sampson*, 251 F.R.D. at 179 (citations omitted) ("Although, some courts require a showing of bad faith before imposing sanctions, the Fourth Circuit requires only a showing of fault, with the degree of fault impacting the severity of sanctions."). The Court further assumes that the selection packet was relevant in the sense that it likely "would naturally have been introduced into evidence." *Id.* at 180 (citation and internal quotation marks omitted).

Green's failure to preserve the selection packet warrants no sanctions, however. As exhaustively explained earlier, the evidence overwhelmingly evinces that Defendants did not pick Plaintiff for the trainer position because they determined that other candidates were more qualified. Carrio, who sat on the panel, supplied most of the relevant testimony. She testified that she did not know of Plaintiff's complaint about discrimination to Warden Green. She further testified that Green played no meaningful role in the selection of the candidates. Additionally, Carrio testified that, although Plaintiff was a decent present and performed well, other candidates outperformed him. Although Defendants have not produced the selection packet, they have produced evaluation forms that they characterize as the "four top evaluations." *See* Doc. No. 49-20 at 21–25. Thus, it is not as if Defendants misplaced all the relevant evidence. In short, no evidence lends itself to the inference that Plaintiff outperformed the other candidates. Thus, instructing the jury to draw this inference would not level the playing field; it would unfairly tilt it in Plaintiff's favor. Accordingly, the Court declines to impose sanctions for Defendants' misplacement of the selection packet.

b. Gilliam's Notes of Moore Interview

In mid-February 2011, Moore approached one or more Department officials and alleged that someone tried to establish an inappropriate relationship with him. Although the Parties dispute the exact date on which Defendants learned that Plaintiff was the person whom Moore implicated, this date fell between February 16, 2011 and February 24, 2011. During this period, Gilliam interviewed Moore and took notes of their discussion. Gilliam failed to preserve these notes. Warden Green decided not to participate in the investigation due to the pending EEOC complaint.

Based on these facts, Defendants arguably could have reasonably foreseen that the notes might have been relevant to litigation. Green decided not to participate in the investigation because of the pending EEOC complaint and assigned it to Gilliam. Although Moore's inchoate allegations were apparently unrelated to the EEOC complaint, Green's concerns arguably should have triggered awareness of the potential for litigation. The Court further assumes that Gilliam's failure to preserve the notes was negligent. It was not grossly negligent, however, as the investigation was just starting and Gilliam had no way of knowing whether the inmate's allegations had a basis in fact.

A reasonable fact-finder could not, however, conclude that the unpreserved notes would have supported Plaintiff's claims. Tellingly, Plaintiff argues elsewhere that statements attributed to Moore are inadmissible. *See, e.g.*, Doc. No. 74 at 5–9. Furthermore, sanctions would not be in order even had Plaintiff satisfied the elements for spoliation. Gilliam's conduct is at most negligent and the destroyed notes are of picayune importance in the grand scheme of the case. Hence, the Court declines to impose sanctions for Gilliam's failure to preserve the notes.

### c.    Moore's Formal Complaint

The record does not reflect that Moore ever filed a formal, written complaint of discrimination. Rather, the record reflects that Moore orally complained. The record further reflects that Defendants have submitted electronic communications memorializing certain aspects of their discussions with Moore. Therefore, this argument fails.

### d.    Computer Record About Pod Helpers

It is undisputed that Plaintiff let Moore out of his cell. Defendants essentially assert that Plaintiff did this to help him establish his EEOC case by showing Moore information on a computer. Plaintiff responds that, as a pod helper, Moore was allowed to be out of his cell. Plaintiff further argues that Moore could not have seen anything on the computer. Plaintiff contends that the computer contained a list of the pod helpers who were allowed to be outside of their cells on that day. A forensic study did not produce such a document.

Plaintiff's argument relating to the missing computer record fails. Plaintiff has not shown that a record of pod helpers containing his name existed. Although three witnesses testified that the computers in pods usually contain the name of pod helpers, Plaintiff has not shown that the computer in question contained such a list. Indeed, one of Plaintiff's own witnesses testifies that she "didn't have a list" of the pod helpers in Plaintiff's pod on the relevant day because "[t]hat particular computer that day had been down." *See* Doc. No. 70-8 at 6–7. Furthermore, sanctions would be improper even had Defendants spoliated a list of pod helpers containing Plaintiff's name. To reiterate, the fundamental issue is not whether there was "just cause" for Plaintiff's termination but, rather, whether a reasonable juror could conclude that Defendants' numerous neutral reasons operate to obscure discrimination and retaliation. Motive, not wisdom, is what

matters. Even had Moore been allowed to be out of his cell on the day in question, this would not change the fact that a video shows Moore out of his cell and standing near a computer on which Plaintiff was working. While this conduct might have been acceptable under Department policy or custom, Plaintiff has not shown that Defendants proffered this reason to mask an impermissible motive. As a result, the Court declines to impose sanctions for the alleged spoliation of the computer record.

e.      Incomplete Video

Plaintiffs calls for sanctions because the video that showed Moore out of his cell is from 8:00 a.m. to 3:00 p.m. when Plaintiff was assigned to that post from 6:30 a.m. to 3:00 p.m. The Court rejects this argument outright. The relevance of the beginning part of the video is unclear for numerous reasons, one of which is that it would not change the fact that the video shows Plaintiff outside of his cell. Moreover, notwithstanding Plaintiff's repeated exhortations to the contrary, the issue is not whether "the County lacked objective good faith, and did not act with just cause" when it terminated Plaintiff. Doc. No. 70 at 26. As erstwhile expounded, even if Defendants mistakenly believed that Plaintiff had lied, formed an inappropriate relationship with an inmate, and jeopardized security, a reasonable juror could not deduce that Defendants' nondiscriminatory and nonretaliatory reasons disguise discrimination. Accordingly, sanctions for spoliation are not in order.

**N.      Deference to the Arbitrator's Findings**

The Parties have submitted supplemental briefing on whether the arbitrator's findings warrant preclusive effect. Defendants rely on the following case for this proposition: *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974). In *Gardner-Denver*, the Court generally held that an

employee may "pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII." *Id.* at 59–60. The Supreme Court later distinguished *Gardner-Denver* in *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009). In *Penn Plaza*, the Court held that "a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law." *Id.* at 274. In this case, Defendants have not shown that the CBA required Plaintiff to arbitrate his Title VII claims, let alone that it clearly and unmistakably did so.

The failure of a CBA to require an employee to submit his Title VII claims to arbitration, however, does not necessarily preclude courts from deferring to an arbitrator's findings relating to a Title VII claim. In *Gardner-Denver*, the Court clarified that, when courts consider an employee's Title VII claim de novo, "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." 415 U.S. at 60. Courts must decide the amount of weight to afford an arbitral decision "with regard to the facts and circumstances of each case." *Id.* at 60 n.21. "Relevant factors include the existence of provisions in the collective-bargaining agreement that conform substantially with Title VII, the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators." *Id.* "Where an arbitral determination gives full consideration to an employee's Title VII rights, a court may properly accord it great weight." *Id.* "This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record." *Id.*

In this case, the arbitrator's determination that Plaintiff's termination was based on just cause is entitled to great weight. Plaintiff voluntarily grieved his termination and stipulated that the arbitrator must decide the factual issue whether Defendants based their termination of

Plaintiff on just cause. The arbitrator conducted a two-day hearing under trial-like procedures in which lawyers represented the Parties. The hearing involved the presentation of considerable testimony and evidence and, afterwards, the Parties submitted written arguments. This adjudicatory process culminated in the arbitrator's issuance of a fourteen-page, single-spaced decision holding that the County carried its burden of proving that it terminated Plaintiff for just cause. In short, the record reflects that the arbitrator (whose qualifications Plaintiff has not challenged) carefully decided a factual dispute based on an adequate record and in accordance with fair procedures. Furthermore, much of the evidence submitted in this case (including Plaintiff's own admissions) corroborates the arbitrator's findings. For these reasons, the Court defers to the arbitrator's finding that Defendants terminated Plaintiff for just cause.

Plaintiff responds that the arbitrator's determination does not warrant weight because the arbitrator failed to give full consideration to his Title VII rights. That is, Plaintiff argues that the arbitrator determined whether Defendants had just cause for terminating Plaintiff, not whether Defendants retaliated and discriminated against him in violation of Title VII. The record reflects, however, that the arbitrator considered and rejected Plaintiff's argument that Defendants had retaliated against him for complaining about allegedly discriminatory practices. *Compare* Doc. No. 49-10 at 7 ("The Union argues in part that the discharge . . . was in retaliation for his filing of a federal EEO complaint."), *with id.* at 13 ("[T]there is no persuasive evidence that the disciplinary action taken against [Plaintiff] was in retaliation for his filing of an EEO complaint, but rather, was for serious violations of Departmental rules and regulations."). Under *Gardner-Denver*, moreover, the arbitrator does not have to rule on the Title VII claim per se before courts may defer to his or her findings. There, although the employee "testified that his discharge was the result of racial discrimination and informed the arbitrator that he had filed a charge [of

discrimination]," the arbitrator "made no reference to [the employee's] claim of racial discrimination." 415 U.S. at 42. Nevertheless, the Court reversed and remanded the case with instructions that the "arbitral decision [could] be admitted as evidence and accorded such weight as the court [deemed] appropriate." *See id.* at 60. Here, as in *Gardner-Denver*, Plaintiff argued that his termination was based on retaliation. Therefore, even had the arbitrator not addressed this argument, the Court could have admitted the arbitrator's decision and accorded it whatever weight it deemed appropriate. Yet, in contrast to *Gardner-Denver*, the arbitrator expressly considered and rejected Plaintiff's argument that Defendants retaliated against him. Furthermore, the factors that the *Gardner-Denver* Court enunciated counsel favor of according its findings considerable deference, especially considering the corroborating evidence in the record. Therefore, although the arbitrator's decision does not dispose of Plaintiff's Title VII claims, his finding that Defendants fired Plaintiff for just cause warrants great weight.

For these reasons, the Court accords great weight to the arbitrator's determination that Defendants fired Plaintiff for just cause. Consequently, the case against Plaintiff's Title VII and associated claims is even stronger than the Court held above.

**O.      Evidentiary Objections**

Plaintiff objects to thirteen of Defendants' exhibits. The objections fall into two basic categories: (1) Defendants' reports, along with the arbitrator's decision; and (2) affidavits and depositions allegedly containing hearsay. The Court has carefully reviewed Plaintiff's objections to these exhibits and considers them to be meritless. To buttress this conclusion, the Court incorporates by reference Defendants' arguments from its applicable memoranda. *See* Doc. No. 65 at 7–14; Doc. No. 75.

All the same, the Court makes a few remarks regarding the admissibility of these exhibits. Plaintiff's objections to Defendants' affidavits and depositions are unfounded. Rule 56 clearly contemplates the consideration of affidavits and deposition testimony on summary judgment. Fed. R. Civ. P. 56(c)(1)(A). Plaintiff's objections to these exhibits are conclusory and appear to be based largely on the idea that they contain the hearsay of Inmate Moore. To the extent these affidavits contain the out-of-court statements of Moore, the statements are admissible not for their truth but to explain the course of Defendants' investigation of Plaintiff. *See United States v. Love*, 767 F.2d 1052, 1063–64 (4th Cir. 1985) (citation and internal quotation marks omitted) ("[O]utlining the background of the investigation with the evidence not being offered to prove its truth, it could be said not to be nonadmissible as hearsay."). The Court also discards Plaintiff's objections to the Memorandum, Statement, Notice, and other related records of the investigation. Beyond being business records, these documents are admissible as public records under Federal Rule of Evidence 803(8). Rule 803(8) provides that the rule against hearsay does not exclude a record or statement of a public office containing the "factual findings from a legally authorized investigation." *See* Fed. R. Evid. 803(8). Defendants assert, and Plaintiff does not contest, that they were legally authorized to investigate Moore's allegations. *See* COMCOR 33.07.01.33, § 33-6(a), (2) ("A supervisor who is considering taking a disciplinary action should: . . . (2) conduct an investigation . . . ."). Plaintiff also argues that these records contain the hearsay of Moore. To the extent these records contain Moore's out-of-court statements, they are admissible in light of *Love*, *supra*. Moore's statements may also be admissible as other acts' evidence and/or a then-existing mental state for the purpose of proving motive. *Cf.* Fed. R. Evid. 403(b)(2); *Haddad v. Lockheed Cal. Corp.*, 720 F.2d 1454, 1456 (9th

Cir. 1983) (citing Fed. R. Evid. 803(3)). Accordingly, the Court rejects Plaintiff's evidentiary objections.

## IV.     CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Leave to Amend Complaint, and **DENIES** Plaintiff's Motion for Sanctions for Fabrication and Spoliation of Evidence. A separate Order closing the case with prejudice follows.

_____                              _____
          June 24, 2013                                                                        /s/
               Date                                                            Alexander Williams, Jr.
                                                                               United States District Judge